## In re SILKMAN.

(Supreme Court, Appellate Division, Second Department. November 25, 1903.)

1. SURROGATE—PRACTICE AS ATTORNEY—VIOLATION OF CONSTITUTION—SUSPENSION.

Since Const. art. 6, § 20, forbidding a surrogate to practice as an attorney in any court of record, ipso facto suspends him from practice on his election, an order of the Supreme Court suspending him generally from practice is superfluous.

2. SAME—DISBARMENT—JURISDICTION.

Code Civ. Proc. § 67, providing that an attorney guilty of any "deceit, malpractice, crime or misdemeanor" may be suspended from practice or removed from office by the Appellate Division, does not cover the case of a surrogate who practices as an attorney in violation of Const. art. 6, § 20, especially as his offense is committed in his capacity of surrogate, and not as an attorney.

3. SAME.

While the Appellate Division of the Supreme Court may have inherent power to discipline attorneys for improper conduct exhibiting turpitude or loss of good character, yet in view of Const. art. 6, § 11, providing for the removal of judicial officers, including surrogates, by the Senate on recommendation of the Governor, preceded by a hearing, etc., and section 20, providing that no one shall be eligible to the office of surro-

84 N.Y.S.—65

gate who is not an attorney, that tribunal is without power to disbar a surrogate who violates section 20, forbidding surrogates to practice as attorneys.

Goodrich, P. J., dissenting.

Original proceedings for the suspension or disbarment of Theodore H. Silkman, as attorney and counselor at law. On return to an order to show cause. Motion for suspension denied.

Argued before GOODRICH, P. J., and BARTLETT, WOODWARD, HIRSCHBERG, and HOOKER, JJ.

James M. Hunt, for the motion.

J. Rider Cady, opposed.

HIRSCHBERG, J. This proceeding was instituted by Mr. James M. Hunt, an attorney and counselor of the Supreme Court, by the presentation of verified charges against the Hon. Theodore H. Silkman, surrogate of the county of Westchester, accusing him, in the precise language of the charges, of "practicing as an attorney and counselor at law in the Supreme Court, Westchester county, and before this Appellate Division of the Supreme Court, said Supreme Court being a court of record of this state, in violation of the provisions of section 20 of article 6 of the Constitution of this state, and in violation of his official oath as surrogate of the county of Westchester, which oath was taken pursuant to the provisions of section 1 of article 13 of the Constitution of this state." An order was duly issued upon these charges requiring Mr. Silkman to show cause why an order should not be made suspending him from practice during the continuance of his term of office as surrogate, and why such other and further order should not be made as to the court might seem just. A hearing having been had upon the return of the order to show cause, we are now called upon to dispose of the proceeding.

The provision of the Constitution which Mr. Silkman is charged with violating is the following, contained in section 20 of article 6, viz.: "Nor shall any judge of the Court of Appeals, or justice of the Supreme Court, or any county judge or surrogate hereafter elected in a county having a population exceeding one hundred and twenty thousand, practice as an attorney or counselor in any court of record of this state, or act as referee." Mr. Silkman was elected surrogate at the general election in the year 1900, at which time it is claimed that the population of the county of Westchester largely exceeded the prescribed number; but it is contended in his behalf that the word "population" as used in the section of the Constitution cited is to be confined to the citizen inhabitants, excluding aliens, and that so construed the population of the county at the time of his election was within the limit of one hundred and twenty thousand.

The question has been argued with force and ability on either side, but in the view taken of our jurisdiction we do not deem it necessary or proper to decide it. Assuming that at the time of Mr. Silkman's election it be true that the county of Westchester contained a population exceeding 120,000 within the meaning of the section referred to, then it necessarily follows that upon taking office on January 1,

1901, he was by the express terms of the Constitution at once, suspended from practice as effectively as he could possibly be by any order of this court. In so far as the application, therefore, seeks the expression of this court's opinion upon the abstract question of his right to practice in the absence of any special case in which he is assuming so to do, it but invites either the mere expression of opinion, or, at most, an order in the form of a supplementary mandate indorsing and confirming the suspension already pronounced by the fundamental law. To be effective, the action of the court should go beyond suspension, already pronounced by the Constitution, in the view now considered, and should result in disbarment, and the jurisdiction of the court should be considered with respect to the power to decree such disbarment.

The statutory power conferred upon this court in the premises is contained in section 67 of the Code of Civil Procedure, and so far as applicable it provides that "an attorney and counsellor, who is guilty of any deceit, malpractice, crime or misdemeanor, * * * may be suspended from practice, or removed from office, by the Appellate Division of the Supreme Court." There is no charge in this case of the commission of any crime or misdemeanor, and the deceit and malpractice referred to relate, we think, to some act of professional deceit and malpractice. If, however, Mr. Silkman has violated the injunction of the Constitution, he has offended as surrogate, and not as an attorney. As an attorney his right to practice law is undoubted, and it is only as surrogate that it is or can be questioned, and it follows that the violation of the Constitution, if it has been violated, has been committed by him in his judicial or official, rather than in his professional, capacity.

But it is urged that the Appellate Division has "inherent" power to discipline lawyers, and that an offense committed by a judge in practicing, when prohibited, is likewise an offense committed by him as a lawyer, which calls for the exercise of the inherent power. It may be conceded that an inherent power exists, in the court by which attorneys are admitted to practice law, to discipline them in their profession for any conduct exhibiting turpitude or the loss of that good character which was essential to admission, and which must be deemed equally essential to continuance at the bar. But in the case of transgressions by judicial officers the Constitution provides for punishment by removal from office, which, in the absence of a distinct expression to the contrary, should be deemed exclusive. Section 11 of article 6 of the Constitution provides that judges of the Court of Appeals and justices of the Supreme Court may be removed by concurrent resolution of both houses of the Legislature, and that all other judicial officers, except justices of the peace and judges or justices of inferior courts not of record, may be removed by the affirmative vote of two-thirds of the members of the Senate on the recommendation of the Governor. Such removal must be preceded by a hearing and solemnized by the entry on the legislative journal of the votes of the Senators. It cannot be that the law contemplates that the Appellate Division should possess the inherent power of disbarring the judges of the Court of Appeals and the justices of the

Supreme Court as lawyers for the violation of judicial duty, even though the violation may incidentally involve some professional impropriety. Mr. Hunt insisted upon the argument that it is within the power of the Appellate Division to disbar a judge of the Court of Appeals if he attempted to practice law, and it is evident that such a view is essential to the logic of his position. We think the state-ment of the claim carries its own refutation. Section 20 of article 6 of the Constitution provides that no one shall be eligible to judicial office, including that held by Mr. Silkman, who is not an attorney and counselor of this state. The disbarment, however, would not operate to remove the incumbent from his office, for that clearly can only be done in the manner prescribed by the Constitution. The absurd, not to say scandalous, result would therefore be exhibited, upon the exercise of this alleged inherent power, of a judicial officer disbarred for misconduct as an attorney, yet retaining his official place and power after he has thus been judicially decreed to be unfit, and at the same time incidentally deprived of an essential constitutional element of eligibility.

We think the jurisdiction invoked does not exist, and that the charges should accordingly be dismissed. It is proper, however, to add that if the fact was established that the county of Westchester, at the time of Mr. Silkman's election, did contain more than 120,000 of population within the meaning of the Constitution, it would un-doubtedly be the duty and within the power of any court of record in the state in which he should attempt to practice law to prohibit and prevent him from so doing. All we decide is that we are not called upon to give an abstract opinion upon his right to practice law or to act as referee in the absence of an actual case brought within our jurisdiction and involving the question; that a suspension pronounced by this court would add nothing to the force of a suspension pro-nounced by the Constitution of the state; and that, under the circum-stances of the case, neither the suspension nor disbarment of judicial officers as attorneys being embraced within the express statutory jurisdiction conferred upon the court, such jurisdiction should not be assumed under the guise of inherent power.

Motion denied, without costs. BARTLETT and HOOKER, JJ., concur.

WOODWARD, J. (concurring). I would content myself with a simple concurrence in the views expressed by Mr. Justice HIRSCH-BERG were it not that I feel that the dissenting opinion of Presiding Justice GOODRICH does not present the correct view of the law in so far as it relates to the question of population for political and ad-ministrative purposes. In passing, it may be proper to suggest that, while the definitions quoted from the standard dictionaries correctly defined the word "malpractice" in the abstract, I am clearly of the opinion that, as applied to practitioners before this court, it must have some relation to the discharge of professional duties. As was said in the Matter of Baum (Sup.) 8 N. Y. Supp. 771, "Malpractice as a lawyer means evil practice in a professional capacity, and the resort to methods and practices unsanctioned and prohibited by law;" and

in Yate's case, 4 Johns. 367, it was said that "the word 'malpractice' is an appropriate term for a contempt committed by an attorney or solicitor in abusing the practice of the court." So, in Macon v. Shaw, 16 Ga. 186, it was held that the crime of gambling by a city marshal did not constitute "malpractice in office," within a statute authorizing his dismissal for such malpractice, and I know of no rule of construction which warrants an enlargement of the jurisdiction of a court of justice for the purpose of limiting human liberties.

Theodore H. Silkman, an attorney and counselor at law, was elected to the office of surrogate of Westchester county, and entered upon the discharge of his duties as such officer on the 1st day of January, 1901, after having taken and subscribed the constitutional oath of office, and it is admitted that he has continued to practice his profession and to act as a referee from that time up to the present. It is alleged on the part of the moving parties that the county of Westchester has a population in excess of 120,000, and, if this allegation is true, within the letter and spirit of the provision of the Constitution above set forth, there can be no doubt that it is the duty of Mr. Silkman to refrain from further activities along the lines which he has been following. Generally speaking, the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or vocation, is the constitutionally declared right of the individual. Matter of Application of Jacobs, 98 N. Y. 98, 106, 107, 50 Am. Rep. 636, and authorities there cited. While it is not to be doubted that it is within the powers of the state to determine the conditions upon which any person may accept public office, it is no part of the duty of the courts to extend the limitations thus made beyond the letter and spirit of the enactment. Mr. Silkman has a right to practice his profession. This right is guarantied by both the state and federal Constitutions, and in accepting the office of surrogate he is not deemed to have sacrificed any of these rights beyond the strict letter of the constitutional requirement, read in the light of those rules of interpretation and construction with reference to which all laws are presumed to have been enacted. There is no respectable authority with which we are familiar which warrants the construction of statutes or constitutions to take away the fundamental rights of the individual beyond the strict letter and spirit of the law, and the authorities are numerous that where the enactment creates a new rule, unknown to the common law, it should be construed strictly against the state or municipality, and liberally in favor of the citizen. Sprague v. City of Rochester, 159 N. Y. 20, 26, 53 N. E. 697; Schneider v. City of Rochester, 160 N. Y. 165, 172, 54 N. E. 721, and authorities there cited. A constitution is an instrument of government made and adopted by the people for practical purposes connected with the common business and wants of human life (The People v. The New York Central Railroad Co., 24 N. Y. 485), and should be construed to promote the great objects for which it was made (North River Steamboat Co. v. Livingston, 3 Cow. 713, 750), without unnecessarily infringing upon the rights of individuals. In giving construction to a constitutional provision the whole provision is to be considered, and

the real intent should prevail over the strict letter; but that intent must be gathered from the language, unless this would lead to palpable injustice, contradiction, or absurdity. Adams v. E. R. S. Institution, 136 N. Y. 52, 32 N. E. 622. And "all words, whether they be in deeds or statutes, or otherwise, if they be general, and not express and precise, shall be restrained unto the fitness of the matter or person." Union Hotel Company v. Hersee, 79 N. Y. 454, 461, 35 Am. Rep. 536, citing Bacon's Maxims of the Law, Regula, X. Having these general rules in mind, and keeping in view the duty of this court to use care that in the administration of the law it does not permit any member of this state to be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers (article 1, § 1, State Const.), let us examine the Constitution of this state, and see if it is necessary, in carrying out the great purposes for which it was designed, to deprive Mr. Silkman of his natural right to use his faculties in discharging his duties as an attorney and counselor of this court at the same time that he is engaged in the work of administering the office of surrogate of Westchester county.

What are we to understand by the words, "having a population exceeding one hundred and twenty thousand," as used in section 20 of article 6 of the state Constitution? Is the word "population" one of so precise definition that it may not be "restrained unto the fitness of the matter," and be made to conform to the spirit of the instrument in which it is used? We think not, and we are clearly of opinion that the words "having a population," when used in the Constitution of this state, which is to be considered as a whole, complete in itself, force to be given to every provision contained in it, and each clause explained and qualified by every other (People ex rel. Balcom v. Mosher, 163 N. Y. 32, 36, 57 N. E. 88, 79 Am. St. Rep. 552), are to be understood as limited to the resident citizen population of the county. The Constitution of the state is a complete instrument. It provides for the creation of the departments of the state, and limits the powers of the several departments, and when it speaks of the population of the state, or of any of the subdivisions of the state, we are to find the meaning of the words from the sense in which they are used in connection with the other clauses of the instrument. The Constitution provides a way of determining the population of the state for political purposes, and the readjustment of the political divisions of a sovereignty with a view of the representation of those divisions, or of the inhabitants thereof, in the Legislature, is in its nature a political power, as distinguished from a legislative or judicial power. People ex rel. Carter v. Rice, 135 N. Y. 473, 499, 31 N. E. 921, 928, 16 L. R. A. 836. This power, it is said by the same authority, resides "in the first instance with the people, who in this country are the source of all political power." But it is to be observed that the words "the people," as used in a constitutional sense, although as precise and comprehensive as "population," do not include all of the inhabitants of the state, in its broadest sense. The first Constitution of this state, adopted in 1777, "in the name and by the authority of the good people of this state," ordained, determined,

and declared "that no authority shall, on any pretense whatever, be exercised over the people or members of this state, but such as shall be derived from and granted by them." But it is a well-established fact that the negro inhabitants of the state, then in a state of slavery, were given no voice in the election of representatives, or in determining any of the political questions of the day. People ex rel. Carter v. Rice, 135 N. Y. 493, 31 N. E. 921, 16 L. R. A. 836; Dred Scott v. Sandford, 19 How. 393, 408, 410, 15 L. Ed. 691; 2 Kent's Com. 254, 255, 256. It is equally true that the Indians who occupied reservations or the territory of which they were the original owners of the soil within this state were no part of "the people," but were regarded as dependent nations, wholly distinct from the white community. Dred Scott v. Sandford, 19 How. 403, 15 L. Ed. 691; The Cherokee Nation v. The State of Georgia, 5 Pet. 1, 8 L. Ed. 25. "The words 'people of the United States' and 'citizens' are synonymous terms, and mean the same thing," say the court in Dred Scott v. Sandford, 19 How. 404, 15 L. Ed. 691. "They both describe the political body who, according to our republican institutions, form the sovereignty, and who hold the power and conduct the government through their representatives. They are what we familiarly call the 'sovereign people,' and every citizen is one of this people, and a constituent member of this sovereignty." Again, the same authority says: "It is true, every person, and every class and description of persons, who were at the time of the adoption of the Constitution recognized as citizens in the several states, became also citizens of this new political body, but none other. It was formed by them, and for them and their posterity, but for no one else." If "the people" in a constitutional sense means citizens, it is equally true that in a general sense people constitute population. Webster defines "people," "(2) Persons, generally; an indefinite number of men and women; folks; population, or part of population." The same authority defines "population" to be "the whole number of people, or inhabitants, in a country, or portion of a country." Cooley in his Constitutional Limitations (6th Ed. p. 754) says that "the words 'inhabitant,' 'citizen,' and 'resident,' as employed in different constitutions to define the qualifications of electors, mean substantially the same thing." Mr. Chief Justice Taney, in the Dred Scott Case, 19 How. 403, 15 L. Ed. 691, in speaking of the negro, says: "The situation of this population was altogether unlike that of the Indian race," etc.; thus giving a limited use of the word, and indicating that it is not necessarily used in a comprehensive sense. When we find, therefore, in the preamble to the first Constitution, a·quotation from the resolves of the Continental Congress that "whereas, his Britannic majesty, in conjunction with the Lords and Commons of Great Britain, has, by a late act of Parliament, excluded the inhabitants of these United Colonies from the protection of his crown," we are to understand that the reference is to the inhabitants or the people of the political community to which reference is made, and not to the negroes, Indians, or other aliens who may have been within the territorial limits; and, as the people and inhabitants make up the population of the state in its political aspects,

when we find the Constitution providing for an enumeration of the inhabitants, for the purpose of determining, adjusting, and maintaining the equal political powers of the various subdivisions of the state, we are justified in concluding that it was the purpose of the provision to enumerate the political population or the people, using these words in their constitutional sense. As showing how words of comprehensive scope may be limited by circumstances, the court in the Dred Scott Case, 19 How. 410, 15 L. Ed. 691, in speaking of that clause of the Declaration of Independence which declares, "We hold these truths to be self-evident: that all men are created equal; that they are endowed by their Creator with certain unalienable rights," etc.—say:

"The general words above quoted would seem to embrace the whole human family, and if they were used in a similar instrument at this day would be so understood. But it is too clear for dispute that the enslaved African race were not intended to be included, and formed no part of the people who framed and adopted this declaration; for if the language, as understood in that day, would embrace them, the conduct of the distinguished men who framed the Declaration of Independence would have been utterly and flagrantly inconsistent with the principles they asserted," etc. "They spoke and acted according to the then established doctrines and principles, and in the ordinary language of the day, and no one misunderstood them. The unhappy black race were separated from the white by indelible marks and laws long before established, and were never thought of or spoken of except as property, and when the claims of the owner or the profit of the trader were supposed to need protection."

When the people, the custodians of the political power of the state, as distinguished from negroes and other aliens present within the territory, met, and in the name of the "good people of the state" enacted a Constitution for the government of themselves through legislative, judicial, and executive departments, they provided, among other things, for the creation of a legislative power, consisting of two houses, the representatives in which were apportioned to the then existing counties; and it was also provided (article 5) "that as soon after the expiration of seven years (subsequent to the termination of the present war) as may be a census of the electors and inhabitants in this state shall be taken, under the direction of the Legislature. And if, on such census, it shall appear that the number of representatives in assembly from the said counties is not justly proportioned to the number of electors in the said counties respectively, that the Legislature do adjust and apportion the same by that rule. And further, that once in every seven years, after the taking of the said first census, a just account of the electors resident in each county shall be taken, and if it shall thereupon appear that the number of electors in any county shall have increased or diminished one or more seventieth parts of the whole number of the electors, which, on the said first census, shall be found in this state, the number of representatives for such county shall be increased or diminished accordingly, that is to say, one representative for every seventieth part, as aforesaid." The electors, who will be seen to have constituted the basis of representation in the assembly, were to consist of "every male inhabitant of full age, who shall have personally resided within one of the counties of this state, for six months immediately

preceding the day of election, * * * if during the time afore-said, he shall have been a freeholder, possessing a freehold of the value of twenty pounds, within the said county, or have rented a tenement therein of the yearly value of forty shillings, and been rated and actually paid taxes to this state," with a special provision for the freemen of the cities of Albany and New York. Article 7, orig-inal Constitution. It was also provided (article 8) "that every elec-tor, before he is admitted to vote, shall, if required by the returning officer or either of the inspectors, take an oath, or if of the people called Quakers, an affirmation, of allegiance to the state." Very similar provisions were made for the Senate. It thus appears that in the original Constitution the electors, who were inhabitants who could take an oath of allegiance to the state, thus becoming citi-zens, constituted the basis of representation. It was a purely polit-ical regulation, and the provision for a census of "the electors and inhabitants of this state" was understood to be a census of the elec-tors and citizens of the state, and it is to be observed that the sub-sequent censuses at periods of seven years were confined to the electors who were citizens. The whole scope and purpose of the census provided in the original Constitution was to determine, ad-just, and maintain the political equilibrium of the citizenship, in whom rested the sovereign powers and authority of the state. Article 1, original Constitution. Construing a provision of the Constitution of New Hampshire, that "every male inhabitant of each town" should have the right to vote, the Opinion of the Judges, 8 N. H. 574, lays down the opinion of the court that "the term 'inhabitant,' as used in this relation, was not intended to include all residents, and rea-sons of public policy seem to show conclusively that it must be con-fined to such inhabitants as are citizens of the state." Cooley in his Constitutional Limitations (6th Ed.) p. 754, says: "The words 'in-habitant,' 'citizen,' and 'resident,' as employed in different constitu-tions to define the qualifications of electors, mean substantially the same thing, and one is an inhabitant, resident, or citizen at the place where he has his domicile or home." See Shaw v. Quincy Mining Co., 145 U. S. 444, 451, 12 Sup. Ct. 935, 36 L. Ed. 768. That this constitutional provision for a census of the inhabitants was not in-tended to be an enumeration of all of the persons who inhabited the state for the purpose of determining its population is evidenced by the universal practice of taking a separate enumeration of the In-dians upon the various state reservations, and never including their number in the returns of population for the counties in which such reservations are located. See Exhibit D, Senate Document No. 60, for the year 1892; see, also, chapter 5, p. 5, of the Laws of that year. It is also important to note that for some purposes corpora-tions created under the laws of New York are inhabitants of the state (Shaw v. Quincy Mining Co., 145 U. S. 444, 451, 12 Sup. Ct. 935, 36 L. Ed. 768; Galveston, etc., Railway v. Gonzales, 151 U. S. 496, 503, 14 Sup. Ct. 401, 38 L. Ed. 248), although never appearing in the enumeration of inhabitants; and an act which imposed the burden of making and repairing bridges upon the inhabitants in a town or county has been held by that term to include all holders

of houses and lands in the locality, whether resident or not, but as
excluding actual dwellers who had no ratable property in the place,
such as servants, etc. (Union Hotel Co. v. Hersee, 79 N. Y. 454,
461, 35 Am. Rep. 536, and authorities there cited). These and many
other authorities might be cited to show that the word "inhabitants"
has no exact definition, and that it comes, therefore, within the rule
cited above from Bacon's Maxims of the Law, and must "be re-
strained unto the fitness of the matter." That is, in the use made
of it in reference to an enumeration of the inhabitants for the pur-
pose of fixing the political equilibrium of the state, it should be con-
fined to those who are the actual or potential custodians of the polit-
ical power of the state—to the citizens of the State; and if, for sta-
tistical or other purposes, it is desirable that the number of aliens
should be shown, this has no relation to the political population of
the state, the determination of which was the sole object of the con-
stitutional provision. This was the view of the Constitution which
went into effect on the 1st day of January, 1823, for it was provided
(article 1, § 6):

"An enumeration of the inhabitants of the state shall be taken, under the
direction of the Legislature, in the year one thousand eight hundred and
twenty-five, and at the end of every ten years thereafter; and the said dis-
tricts shall be so altered by the Legislature, at the first session after the
return of every enumeration, that each senate district shall contain, as
nearly as may be, an equal number of inhabitants, excluding aliens, paupers,
and persons of color not taxed; and shall remain unaltered until the return
of another enumeration, and shall at all times consist of contiguous terri-
tory," etc.

Similar provisions were made in reference to the Assembly, and
it is clear that the enumeration contemplated merely taking into
consideration the political citizenship of the state, as a foundation
for the adjustment of the representation of the persons who consti-
tuted the sovereignty of the state, without any reference to aliens
or those who were excluded from the elective franchise. There
being no other purpose to be served than to determine the number
of citizens who were entitled to representation in the political affairs
of the state, it follows that the enumeration of inhabitants required
by the Constitution was of the citizen inhabitants, and the further
provisions, that aliens and paupers and persons of color not taxed
should be excluded in calculating the basis of representation, was
merely for greater certainty, and indicated the policy of the state to
exclude from the political or governmental powers all such persons
as could not be relied upon to sustain and support the government.
This was further evidenced by a change in the language of the quali-
fications for voters, and requiring male citizens "of the age of
twenty-one years, who shall have been an inhabitant of this state
one year preceding any election." By inference the elector must
have been a citizen before, but now it was made necessary by a posi-
tive requirement, and the word "inhabitant" is used in the sense of a
resident of the state, but likewise in connection with his citizenship.
The Constitution of 1846 practically re-enacted the enumeration pro-
visions of the previous Constitution, and the growing population
of the state for the first time demanded a radical reorganization of

the judicial department, and it was provided by section 4 of article 6 that the state should be divided into eight judicial districts, of which the city of New York should be one, and the others were to be bounded by county lines, and to "be compact and equal in population as nearly as may be"; and while the question was never raised, so far as we are able to discover, it is hardly to be doubted that the same rule of determining the apportionment of these judicial districts, and the justices who were to hold the court, prevailed which was prescribed for the Legislature. The population and apportionment were determined by the enumeration provided for by the Constitution, leaving out of the calculation all other than citizens of the state, and the Constitution of 1894 makes this clear in section 1 of article 6 by providing that the successors of the justices shall be elected by the electors of their respective districts, and that the "Legislature may alter the judicial districts once after every enumeration under the Constitution of the inhabitants of the state, and thereupon reapportion the justices to be thereafter elected in the districts so altered."

The essential error in the reasoning of the learned presiding justice, as I view this question, is that he seeks to give a popular general meaning to words which are used in a limited sense, failing to construe them in the connection in which they are used. He says:

"The words 'inhabitants excluding aliens' are used in article 3 in reference to the exercise of political powers, while in article 6, § 20, the word 'population' is used with reference to judicial functions. In the exercise of political powers aliens are not entitled to consideration, as they have no participation therein, but their rights are to be regarded in respect of judicial functions which may come to have jurisdiction over their property."

What right or interest has an alien in the mere machinery through which the laws are administered, more than in the making of the laws themselves? "We, the people of the state of New York, grateful to Almighty God for our freedom, in order to secure its blessings, do ordain this Constitution." Preamble to state Const. It is not, "We, the people in the state of New York," but "We, the people of the state of New York"; we who have interests and citizenship; we who are "grateful to Almighty God for our freedom"—for that freedom and liberty which is ours by virtue of our birth and citizenship within the state—who ordained this Constitution. When we reflect that "We, the people of the state of New York," who have ordained this Constitution; we who have formulated and adopted its provisions, without any aid or assistance from any of the Indians, disfranchised persons, or aliens—do not constitute all of the inhabitants or population, using those words in their broadest sense, but merely those in whom is vested the sovereignty of the state, it seems absurd to say that the word "population," used in the same instrument, and with reference merely to a matter of policy, can be enlarged to cover all of those who may happen to be within a political division, so as to enable aliens to encroach upon the franchises of a citizen of this state. The creation of judicial tribunals, the limitations which shall be imposed upon those who are called upon to discharge judicial functions, and all of the details of administration, are merely matters of a political nature, with which aliens have no

concern; and to give the word "population" the scope contended for, and thus negatively empower the aliens who may be present in a political division of a state to determine its public policy, is to extend the scope of the Constitution to enfranchise those who have no part or interest in our political institutions, and to give to the word "population" a broader meaning than "the people." All the interest that an alien can have in our institutions and laws is that he shall be protected under them, and this is abundantly guarantied under those comprehensive provisions found in sections 1 and 6 of article 1 of the state Constitution, the fourteenth amendment to the federal Constitution, and that general comity which regards the rights of citizens of friendly states. Where the Constitution intends to include within its provisions aliens as well as citizens, it adopts appropriate language for that purpose. In the first section, which is intended to guard alike the rights of citizens and aliens, it is provided that "no member of this state shall be disfranchised or deprived of any of the rights or privileges," etc. In the sixth section, where the purpose is the same, it is provided that "no person" shall be "deprived of life, liberty or property without due process of law," and the same comprehensive language is found in the fourteenth amendment, while in all matters which relate to the political institutions of the country more general language is used; but it is always to be understood as limited to "We, the people of the state of New York," or "We, the people of the United States," who are desirous of securing "the blessings of liberty to ourselves and our posterity"; for these are the people who make the Constitution and the laws, and it is a maxim of our institutions that these governments derive their just powers "from the consent of the governed," and not from those who are temporarily within our jurisdiction, or those who are not amenable to our laws. Aliens, therefore, not constituting a part of "We, the people of the state of New York," or of the United States, cannot properly be contemplated in any provision which relates to the political powers or limitations of the state. They are to be treated as though they had no existence, in so far as the political functions of the state are concerned. But when the state has acted, when it has formulated constitutions and laws, the alien who is present within our boundaries has a natural and constitutional right to demand that he be given the equal protection of those laws. Yick Wo v. Hopkins, 118 U. S. 356, 367, 369, 6 Sup. Ct. 1064, 30 L. Ed. 220. As the Constitution derives no force or power from Indians or other aliens, it cannot, in the absence of express language, be supposed to have been enacted with reference to them; and when it makes a political right, or the limitation of a political or civil right, to depend upon the population of the state, or of any subdivision of the state, it follows logically that it contemplates the population which constitutes "We, the people," and has no reference to Indians or other aliens, who are no part of the people of the state, although they may be within the state. The people of the state are those who constitute the state, while aliens are, in contemplation of law, merely temporarily sojourners, here by our courtesy, and owing no other duty to the state than obedience to its laws.

It might just as well be said that the constitution of the Brooklyn Club, in its governmental powers, was made with reference to the visitor of a day, as to hold that the Constitution of this state contemplated that its alien population should be reckoned in determining the right of any citizen to practice his profession within the county of Westchester or any other subdivision of the state. It was "We, the people of the state of New York," who were represented in the constitutional convention; it was "We, the people of the state of New York," who ratified and adopted the Constitution; and not one of us had any idea that it was designed for any other purpose than defining and limiting the governmental powers of "We, the people of the state of New York."

As we have already pointed out, the judiciary article of the Constitution, under which it is urged Mr. Silkman is denied the right to practice his profession in Westchester county, recognizes the enumeration provision of the Constitution as controlling in fixing the judicial districts, which, like those of the Legislature, are to be based upon the citizen population; and it follows, under well-established rules of construction, that section 20 of article 6 must be read and construed in connection with the enumeration section, which provides the only method of determining the population of the state or any of its subdivisions for political purposes. The whole provision is to be considered, and the real intent should prevail over the strict letter; but that intent must be gathered from the language, unless this would lead to palpable injustice, contradiction, or absurdity. Adams v. East River Savings Institution, 136 N. Y. 52, 32 N. E. 622, affirming (Sup.) 20 N. Y. Supp. 12. Surely, the language of the section, read in connection with the whole judiciary article, that being understood in the light of the entire Constitution, can bear no other construction than that the population of 120,000, which determines the rights of Mr. Silkman in this proceeding, is the political population of the county—the citizen population which has the power to participate in the making of the Constitution and its limitations, as well as in the election of the surrogate. To say that it means the entire number of people who may be found within the county, regardless of their relations to the institutions of the state and county; that it means aliens, who are excluded from participating in the election of the surrogate, or the members of the judiciary and the legislative department, or even from aiding in determining the population of the legislative and judicial districts for the purpose of apportioning the officers among them—is closely to approximate an absurdity, and for no other purpose than to prevent an individual from making the most advantageous use of his faculties in the earning of a livelihood. We do not believe that it was the intent to give to the aliens of Westchester county, who are denied all other political powers, the capacity to work this disfranchisement. The evils to be reasonably anticipated from a continuance of the surrogate of that county to practice law does not justify any forced construction to prevent it, and as the provision can have its full force and effect under the enumeration provided for in 1905, if the facts then disclosed warrant it, and the construction which we

have suggested seems in full harmony with the spirit and intent of
the Constitution, taken as a whole, we are disposed to hold that
the words "having a population," in section 20 of article 6 of the
Constitution, are to be construed as meaning citizen population.
The only object of the enumeration, as we have seen, was to de-
termine the citizen population of the state for the purpose of main-
taining the equilibrium of political powers between the various dis-
tricts and counties, without any reference to the alien population,
whose rights are fully protected under the administration of the laws
which bear equally upon ourselves; and when the Constitution makes
the population of a county or district the measure of civil or polit-
ical rights it is doing no violence to language to say that it refers
to the citizen population, which alone has any standing in measuring
or determining political, governmental, or civil rights. The Consti-
tution, in its political aspects, is concerned only with the citizenship
of the state. Aliens have no rights except to an equal administra-
tion of the law, and it cannot be presumed that in making the Con-
stitution of 1894, which introduced this new limitation, the conven-
tion, or the people who adopted it, had any idea that they were
giving to aliens in any part of the state the power, by their mere
presence in any given locality, to determine the political or civil
rights of any citizen of this state. Had such a proposition been
suggested directly, there can be little doubt that the Constitution
would have remained as it was, and it may not be assumed that there
was an intention, within the language and spirit of the Constitution,
which would thus have been fatal to it. "The use of a wrong word,
conceding it to be such," say the court in Blaschko v. Wurster, 156
N. Y. 437, 442, 51 N. E. 303, 305, "which was doubtless an inad-
vertence, should not be allowed to defeat the intention of the law.
When the intention of the lawmakers is discovered it must always
prevail over the literal or accepted meaning of words. The courts
will consider the mischief which the statute was aimed at, and in
order to give it effect words absolute in themselves, and language
the most broad and comprehensive, may be qualified and restricted
by other parts of the same statute, or by the facts and circumstances
to which they relate"—citing Smith v. People, 47 N. Y. 330; People
ex rel. Jackson v. Potter, 47 N. Y. 375. The dictionaries (Webster
and the Century) define "population," "The whole number of people
or inhabitants;" and the Century adds, "A part of the inhabitants
in any way distinguished from the rest, as the German population
of New York." If we give to the word "inhabitants" its political
definition, "citizens," or recognize the clear distinction made by the
Constitution between citizens and aliens, we should have little diffi-
culty in bringing the case within the literal definitions of the dic-
tionaries; but this does not seem to be necessary, under well-estab-
lished rules of interpretation, and it has been said by no less an au-
thority than the Court of Appeals that "it would be dangerous in
the extreme to extend the operation and effect of a written constitu-
tion by construction beyond the fair scope of its terms, merely because
a restricted and more literal interpretation might be inconvenient
or impolitic, or because a case may be supposed to be, to some ex-

tent, within the reasons which led to the introduction of some particular provision plain and concise in its terms." Settle v. Van Evrea, 49 N. Y. 280, 281. The provision of section 20 of article 6 is one of expediency merely. No great principle of human rights is involved in its enforcement, and it was introduced into the fundamental law only because it was alleged that in some instances, in the larger communities, the minor judicial officers had been negligent in a measure of their official duties because of the demands of their practice; and we see no reason why the presence of a few thousands of aliens in the county of Westchester, who have no political rights, should be held to have the power to deprive the respondent of his natural right to make the most advantageous use of his talents, unless that construction of the Constitution is absolutely necessary to give effect to the general purposes of the instrument. The effect of the prohibition ought not to be enlarged by conjecture or implication (Settle v. Van Evrea, 49 N. Y. 285), and a perfectly harmonious construction of section 20, giving that provision a reasonable field of operation, covering, so far as we are informed, the limit of the mischief which brought it into being, there is no occasion for construing the word "population" to mean more than the citizenship within the county.

If we are right in reaching the conclusion above stated, the other questions involved are much simplified. By the provisions of chapter 934 of the Laws of 1895, a portion of Westchester county, embracing the towns of Westchester and Pelham, and the first and second election districts of the town of Eastchester, was annexed to the city and county of New York, and the validity of this act was determined in People ex rel. Henderson v. Supervisors, 147 N. Y. 1, 41 N. E. 563, 30 L. R. A. 74. The last enumeration of the inhabitants of this state was taken in 1892, and this formed the basis of the action of the constitutional convention of 1894. At that time the county of Westchester contained 145,106 inhabitants, using the word in its broadest sense, and of this number 129,224 were citizens and 15,882 aliens. After the act of 1895 went into effect the population was reduced by the number of inhabitants contained in the annexed district, and a computation based upon the figures of the enumeration of 1892, the only one which can form a basis for the political action of the state, shows that there were 130,360 persons all told, of which number 116,481 were citizens and 13,879 were aliens. It thus appears from the figures furnished by the last enumeration made in this state that Westchester has not a population for governmental or political purposes in excess of 120,000, and the respondent does not, therefore, come within the prohibition of the Constitution, so far as we have any judicial knowledge.

But it is urged that under the census of the United States government, taken in 1900, the population of the county is shown to be 184,257, and we are furnished a certificate of the acting director of the census that "according to the official count of the returns of the twelfth United States census the total population of the county of Westchester, in the state of New York, is one hundred and eighty-

four thousand two hundred and fifty-seven"; but there is nothing to indicate what portion of this number are aliens, nor is there any certificate that this is the actual number of inhabitants; so that, unless this court may take judicial notice of the facts set forth in the United States census, for the purpose of determining a purely local and governmental or political question, involving no rights of property, the certificate can serve no useful purpose here, and must be disregarded; for it is a maxim of the law that, "where the court cannot take judicial notice of a fact, it is the same as if the fact had not existed." Broom's Legal Maxims, 121. The United States census is not taken by an officer owing any duty to the state of New York in the discharge of his duties. He may be a citizen of a foreign state, and we are called upon to give full faith and credit only to "the public acts, records and judicial proceedings of every other state" (article 4, § 1, U. S. Const.), and not to the United States, which, in every matter not delegated to its care, is a foreign government (article 10, Amend. U. S. Const.; United States v. Cruikshank, 92 U. S. 542, 550, 551, 23 L. Ed. 588). The state of New York, before there was any United States, had adopted its governmental and political system, had adopted its system of enumerating its citizens for the purpose of maintaining the political equilibrium of the various localities, and this power has never been delegated to the United States or prohibited to this state; so that under the tenth amendment we still have this power, and it is the only method fixed upon by our Constitution for the accomplishing of this purpose. The judiciary article (article 6, § 1) specially recognizes the enumeration provision as determining the population of the judicial districts in reapportioning the same, and, as this is the only method of determining the population of the state for its governmental and political purposes, we see no way of avoiding the conclusion that in determining the population of Westchester county we are to look to the method fixed by the Constitution itself, and that this is to be interpreted in accord with the great purposes for which it was adopted—the government of the state by the citizenship of the state. This seems to us a wholesome view of the question—one consistent with the dignity of the instrument under which we are called upon to administer the laws, and one which has in it less potentiality of evil than to hold that persons having no governmental or political relations to the state may, by their mere presence, defeat the natural right of an individual to make such use of his faculties as he may, consistently with the discharge of his official duties, which we must assume, in the absence of evidence to the contrary, will be discharged in accordance with the spirit and tenor of the oath of office. This view of the question does not defeat any legitimate end of the Constitution. It leaves the provision operative whenever the conditions demanding it arrive, or whenever the Legislature may decide to act upon the authority conferred by section 20 of article 6. The provision remains. The conditions under which it becomes applicable in Westchester county have not yet become judicially known to the court, and until that time arrives there is no occasion for this

court to interfere with the orderly conduct of those who practice at its bar.

The conclusion which we have reached is in accord with the informal correspondence between Honorable Smith Lent, county judge of Westchester county, and this court, under dates of December 18, 1896, December 19, 1896, and December 22, 1896, and is in harmony with the spirit of Settle v. Van Evrea, supra; People ex rel. Williams v. Dayton, 55 N. Y. 367; The People v. Mann, 97 N. Y. 530, 49 Am. Rep. 556; People ex rel. Lent v. Carr, 100 N. Y. 236, 3 N. E. 82, 53 Am. Rep. 161; and generally with the utterances of an enlightened jurisprudence, which finds no delight in limiting the legitimate activities of mankind in any walk of life.

The motion to suspend the respondent, Mr. Silkman, from the practice of his profession, is in all things denied.

GOODRICH, P. J. (dissenting). I agree with Mr. Justice HIRSCHBERG when he says that, assuming it to be true that the county of Westchester contained a population exceeding 120,000 when Mr. Silkman was elected surrogate, "he was by the express terms of the Constitution at once suspended from practice as effectively as he could possibly be by any order of this court." If the population of Westchester county exceeded 120,000 when Mr. Silkman was elected surrogate, and he continued thereafter to practice as an attorney or counselor in any court of record in this state, he disobeyed the fundamental law of the state, and, in my opinion, is guilty of malpractice, the definition of which is given in standard dictionaries as follows: Webster defines it as "evil practice; illegal or immoral conduct; practice contrary to established rules." The Century defines it as "misbehavior; evil practice; practice contrary to established rules." The Standard defines it as "improper or immoral conduct; objectionable practice." Worcester defines it as "practice contrary to rules."

I do not agree with Mr. Justice HIRSCHBERG that if Mr. Silkman has violated the inhibition of the Constitution he has offended as surrogate and not as attorney. True it is that for any breach of the constitutional inhibition, which by his official oath he swore he would support, he might be impeached in his office of surrogate; but it is not his acting as surrogate, but his acting as attorney and counselor, that we are considering. Over the former we have no jurisdiction. Over the latter we have jurisdiction under section 67 of the Code of Civil Procedure, as well as by the inherent power of the court, and by proper method may suspend him from practice or remove him from office as attorney and counselor.

Can it be doubted that, if Mr. Silkman were to be impeached as surrogate for disobedience of the constitutional provision, this court could suspend or disbar him on that account? It seems to be conceded by the counsel of Mr. Silkman that since his election as surrogate he has practiced as attorney and counselor in courts of record in this state. It is conceded that by the state census of 1892 Westchester county contained 130,360 inhabitants, of whom 116,481 were citizens, and 13,879 were aliens.

84 N.Y.S.—66

Mr. Endlich, in his Interpretation of Statutes, § 2, says:

"The first and most elementary rule of construction is that it is to be assumed that the words and phrases are used in their technical meaning if they have acquired one, and in their popular meaning if they have not."

At section 507 he says:

"Like other instruments, a constitution is entitled to a construction as nearly as may be in accordance with the intent of its makers, who, in this case, are the people themselves. Whilst, therefore, phrases that have acquired a settled meaning, thoroughly understood, not only in legal parlance, but in common acceptation, are to be given that significance when used in a constitution, * * * where a phrase has both a technical and a popular meaning the former, which would ordinarily prevail in a statute, will be discarded for the latter in a constitutional provision. Indeed, the language of the Constitution, owing its whole force to its ratification by the people, is always to be taken in its common acceptation—its plain, ordinary, natural, untechnical sense. * * * It follows that where the words of a constitutional provision, taken in their ordinary sense and in the order of their grammatical arrangement, embody a definite meaning, which involves no absurdity or conflict with other parts of the same instrument, the meaning thus apparent on the face of the provision is the only one that can be presumed to have been intended, and there is no room for construction."

With this standard authority in mind, let us consider the meaning of article 6, § 20, of the Constitution. The word "population," there used, does not seem to me to be synonymous with the words "inhabitants excluding aliens," in article 3. It may be synonymous with "inhabitants," but the use of the words "excluding aliens" shows that inhabitants include aliens. Hence we may not exclude aliens in construing section 20, where the word "population" is used without any limiting words.

The words "inhabitants excluding aliens" are used in article 3, in reference to the exercise of political powers, while in article 6, § 20, the word "population" is used with reference to judicial functions. In the exercise of political power aliens are not entitled to consideration, as they have no participation therein, but their rights are to be regarded in respect of judicial functions which may come to have jurisdiction over their property. I again refer to the standard dictionaries for the ordinary, untechnical meaning of the word "population"; that is, its common acceptation. Webster's, Worcester's, the Century, and Standard dictionaries substantially agree in defining "population" as "the whole number of people or inhabitants in a country or district." In my opinion, the word "population" in article 6, § 20, includes all individuals resident in a county; and, as it appears by the census that the number of such persons in the county of Westchester is more than 120,000, the section forbids the surrogate of that county to practice as an attorney or counselor in any court of record of this state, or to act as referee.

It remains only to consider whether in the present proceeding an order may be made suspending Mr. Silkman from practice. I find adequate power in section 67 of the Code of Civil Procedure, which provides that an attorney who has been guilty of malpractice may be suspended from practice or removed from office by the Appellate Division of the Supreme Court. There is no prerequisite of motion

to the court. The court may act of its own motion. The attention of the court having been called to the matter, we are called upon to act.